1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KARLA BADAY,                          No.  1:20-cv-00644-ADA-SKO

12            Plaintiff,                    ORDER GRANTING, IN PART, AND
                                            DENYING, IN PART, DEFENDANTS'
13      v.                                  AMENDED MOTION TO DISMISS
                                            PURSUANT TO FED R. CIV. P. 12(b)(6)
14   KINGS COUNTY, et al.,
                                            (ECF No. 19)
15            Defendants.
                                            ORDER GRANTING LEAVE TO AMEND
16                                          THE COMPLAINT WITHIN **TWENTY-ONE
                                            (21) DAYS**
17

18                                    **I.**

19                          **Procedural Background**

20        On May 6, 2020, Plaintiff filed a complaint asserting six causes of action against two

21   groups of defendants: (1) Kings County and certain county officials (hereinafter "County

22   Defendants"), and (2) Adventist Health Hanford and Georganne Greene, a nurse who works at

23   Adventist Health (hereinafter "Health Defendants").  (ECF No. 1.)  On July 20, 2020, County

24   Defendants filed a motion to dismiss the claims against them.  (ECF No. 14.)  Health Defendants

25   filed their own amended motion to dismiss on August 4, 2020.  (ECF No. 17.)  After filing an

26   opposition to County Defendants' motion, Plaintiff sought leave to amend the complaint to

27   address the pleading deficiencies regarding County Defendants, which the Magistrate Judge

28   granted.  (ECF No. 22.)  Plaintiff filed the First Amended Complaint (FAC) on September 3,

                                       1

1    2020, and County Defendants withdrew their motion to dismiss.  (ECF Nos. 23, 25.)

2    On September 9, 2020, Plaintiff filed an opposition to Health Defendants' motion.  (ECF

3    No. 26.)  Health Defendants replied on September 17, 2020.  (ECF No. 29.)  Plaintiff then filed

4    the Second Amended Complaint (SAC) on February 17, 2021 in order to address certain

5    deficiencies regarding the claims against County Defendants.  (ECF No. 39.)  On February 18,

6    2021, pursuant to stipulation of the parties, the Magistrate Judge dismissed Defendant Daniel

7    Brown, a physician at Adventist Health, from the proceedings.  (ECF No. 41.)  County

8    Defendants proceeded to file an answer on March 23, 2021.  (ECF No. 33.)

9    Plaintiff's SAC states the following claims against Health Defendants.  A claim under 42

10    U.S.C. § 1983 against both Adventist Health and Ms. Greene (Claim 1); a *Monell* claim under

11    section 1983 against Adventist Health only (Claim 2); a claim for supervisory liability under

12    section 1983 against Adventist Health only (Claim 3); a claim for negligence under California

13    state law against both Adventist Health and Ms. Greene (Claim 4); a claim under California

14    Government Code section 815.2 against Adventist Health only (Claim 5); and a claim under

15    California Civil Code section 52.1 against both Adventist Health and Ms. Greene (Claim 6).

16    The procedural history of this case presents an unusual situation.  Plaintiff's SAC

17    superseded both the initial complaint and FAC, and the Court, therefore, treats the earlier

18    complaints as if they do not exist.  *See Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008

19    (9th Cir. 2015).  The filing of an amended complaint would ordinarily moot a previously filed

20    motion to dismiss, like the one at issue in this case.  *LeBarron v. Interstate Group, LLC*, No.

21    2:19-CV-1739 JCM (DJA), 2020 WL 2615900, at *3 (D. Nev. May 22, 2020).  When the

22    amended complaint is substantially identical to the original, however, a court can rule on the

23    motion to dismiss with reference to the amended complaint.  *Id.*  "It would be futile to dismiss [a

24    defendant's] motion without prejudice, only to have [the defendant] refile another motion to

25    dismiss with effectively the same arguments."  *MMG Ins. Co. v. Podiatry Ins. Co. of America*,

26    263 F. Supp. 3d 327, 331 (D. Me. 2017).

27    Here, Health Defendants filed their motion to dismiss after the FAC, but before the SAC.

28    In her request to the court to permit the filing of the SAC, Plaintiff noted that the amendments to

2

1  the FAC clarified only the allegations against County Defendants for deficient policies and

2  procedures.  (ECF No. 36 at 2.)  The SAC also added Deputy District Attorney Anna Marie

3  Samardich Tyner as a Defendant.  (*Id.*)  The allegations pertaining to Health Defendants are,

4  therefore, substantially identical to those in the FAC.  Additionally, the parties filed a Joint Status

5  Report on September 9, 2022, in which they assert that the pending motion to dismiss is fully

6  briefed and still at issue.  (ECF No. 59 at 3.)  Based on this, the Court will proceed in addressing

7  Health Defendants' motion to dismiss with reference to the Second Amended Complaint.

8  **II.**

9  **Factual Background Related to the Claims Against Health Defendants**

10  The claims in this matter arise from Plaintiff's wrongful conviction in 2002 for sexually

11  abusing her girlfriend's three minor children.  At the time of the abuse allegations, Plaintiff and

12  her girlfriend, Maria Medina, had been together for two years and jointly cared for Ms. Medina's

13  children, including then seven-year-old Karina, six-year-old Graciela, and three-year-old Fabian.

14  (ECF No. 39 at ¶ 20.)  On February 8, 2002, Karina and Graciela told Ms. Medina that Plaintiff

15  had inappropriately touched them and Fabian six days before, while Ms. Medina was at the store.

16  (*Id.* at ¶ 22.)  That same day, Ms. Medina brought her children to the Kings County Sheriff's

17  Office, where they described the alleged abuse to a deputy.  (*Id.* at ¶ 24.)  The following day, Ms.

18  Medina took her children to Adventist Health Hanford for an interview with the Sexual Assault

19  Response Team (SART).  (*Id.* at ¶ 27.)  Kings County had contracted with Adventist Health to

20  provide forensic examination, analysis, and testimony regarding alleged sexual abuse.  (*Id.* at ¶

21  14.)  Georgeanne Green, the assigned SART nurse, decided not to conduct a physical

22  examination, after determining that the children were too agitated.  (*Id.*)

23  About a month later, Ms. Medina's children returned to the hospital for a physical

24  examination with Ms. Greene.  (*Id.* at ¶ 28.)  The Deputy District Attorney assigned to the case

25  reviewed, approved, and ratified this visit.  (*Id.*)  During the examinations, Ms. Greene

26  documented several physical abnormalities in each of the children.  (*Id.* at ¶¶ 30, 31.)  According

27  to Plaintiff, Ms. Greene's findings did not provide evidence of physical abuse or prior injury.

28  (*Id.*)  Ms. Greene also asked each child to describe the alleged abuse.  (*Id.* at ¶ 29.)  Contravening

established procedures for this type of investigation, Ms. Greene failed to interview the children in their primary language.  (*Id.* at ¶ 40.)  She also conducted the interview without the assistance of a trained forensic interviewer.  (*Id.*)  Even though Ms. Greene videotaped the interviews and examinations, she did not provide the videotape to Plaintiff or her attorneys until years after Plaintiff's conviction.  (*Id.* at ¶ 41.)

Less than two months after Ms. Greene's examinations, the Kings County District Attorney filed an information charging Plaintiff with three counts of lewd and lascivious acts on a child under fourteen, two counts of forcible sexual penetration, and three counts of terrorist threats.  (*Id.* at ¶ 32.)  The District Attorney's case against Plaintiff hinged almost entirely on Ms. Greene's medical opinions and the testimony of Karina and Graciela.  (*Id.* at ¶ 35.)  Ms. Greene testified to the content of the children's prior statements.  (*Id.* at ¶¶ 37–39.)  She also testified about the physical examinations she performed, asserting that the injuries to Graciela and Fabian were consistent with their descriptions of sexual abuse.  (*Id.*)  After a two-day trial, the jury convicted Plaintiff of all eight counts, and the judge sentenced her to forty-five years to life.  (*Id.* at ¶ 44.)  Fifteen years later, Plaintiff filed a writ of habeas corpus, asserting that she had suffered a wrongful conviction.  (*Id.* at ¶ 45.)  The Kings County District Attorney stipulated to the reversal of Plaintiff's convictions on the basis of newly discovered evidence, and a trial court reversed Plaintiff's sexual abuse convictions.  (*Id.*)  Plaintiff eventually pled guilty to three counts of false imprisonment and received credit for time served.  (*Id.*)

## III.

## Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Though Rule 8(a) does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state

1   a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

2   (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  "A claim has facial plausibility when the

3   plaintiff pleads factual content that allows the court to draw the reasonable inference that the

4   defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In determining whether a

5   complaint states a claim on which relief may be granted, the court accepts as true the allegations

6   in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon*

7   *v. King & Spalding*, 467 U.S. 69, 73 (1984).  It is inappropriate to assume that the plaintiff "can

8   prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that

9   have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of*

10  *Carpenters*, 459 U.S. 519, 526 (1983).

11  **IV.**

12  **Discussion**

13  **A.**     **Claims pursuant to 42 U.S.C. § 1983 (Claims 1, 2, and 3)**

14          To begin, the Court must address two features of Plaintiff's section 1983 allegations.

15  First, Plaintiff names Adventist Health as a defendant under the first two claims of relief: (1)

16  liability under 42 U.S.C. § 1983 and violation of Article 1, section 7 of the California

17  Constitution; and (2) liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  (ECF

18  No. 39 at §§ VII(A)–(B).)  To the extent that Plaintiff asserts both these claims to vindicate

19  federal constitutional rights, they are duplicative as they relate to Adventist Health.  As discussed

20  below, *Monell* provides the avenue by which Plaintiff can assert section 1983 liability against a

21  private entity like Adventist Health.  It is proper, therefore, to dismiss the first claim against

22  Adventist Health and assess its liability under the second claim only.

23          Second, to the extent Plaintiff attempts to use section 1983 as a vehicle to vindicate her

24  right to due process under Article I, section 7 of the California Constitution, that claim fails.

25  Section 1983 "does not provide a remedy for abuses that do not violate federal law." *Collins v.*

26  *City of Harker Heights*, 503 U.S. 115, 119 (1992).

27  ///

28  ///

5

### i.     Health Defendants acted "under color of law."

Title 42 U.S.C. § 1983 provides a cause of action through which individuals may vindicate "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  To state a claim under section 1983, a plaintiff must allege (1) a violation of a federal right, and (2) that the entity or person committing the violation acted under "color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Private conduct is performed under the color of state law when there is "significant" state involvement.  *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983).  While courts have developed several tests to help make this determination, there is no governing formula.  *See id.* at 383.  Regardless of the test they employ, courts must conduct a factual inquiry to determine when state involvement transforms private conduct into state action. *Howerton*, 708 F.2d at 383 (citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961); *see also Lopez v. Dep't of Health Serv.*, 939 F.2d 881, 883 (9th Cir. 1991).  "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient . . .."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  In the context of healthcare providers, the existence of a comprehensive statutory or regulatory scheme will not, alone, support a finding of state action. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  Nor will the mere receipt of federal funds transform a private hospital into a state entity.  *See Watkins v. Mercy Med. Ctr.*, 520 F.2d 894, 896 (9th Cir. 1975).  Additionally, when private hospitals and medical practitioners make medical decisions unencumbered by the state's coercive power, no state action is involved. *See Blum*, 457 U.S. at 1011–12.

Health Defendants argue that they cannot be liable under section 1983 because their actions were of the kind in which private healthcare professionals engage routinely. (ECF No. 19 at 13).  They assert that their contract with Kings County to perform child sexual assault exams did not transform a traditional function of a nurse and hospital into state action.  (*Id.*) Specifically, because individuals can request a SART exam without government involvement, and because the exams have functions beyond criminal investigation, the administration of SART

exams at private hospitals can never constitute state action.  (ECF No. 29 at 7.)  Plaintiff argues that, because the state delegated to Health Defendants the responsibility of conducting forensic investigations, they acted under color of state law.  (ECF No. 26 at 17.)  The dispute is one of framing: was the interaction between Ms. Greene and the children a medical examination or a forensic investigation?  As discussed below, Plaintiff has alleged sufficient facts to indicate that it was the latter, demonstrating that Health Defendants were acting under color of state law.

Health Defendants rely heavily on *Wittner v. Banner Health*, 720 F.3d 770 (10th Cir. 2013).  (*See* ECF No. 29 at 7–8.)  There, a private physician authorized an involuntary mental health hold, pursuant to Colorado state law.  *Wittner*, 720 F.3d at 771.  While the detained individual was at the hospital, a nurse injected him with antipsychotic medication that caused cardiac arrest and, eventually, death.  *Id.* at 771–72.  Because Colorado law permitted private hospitals to take patients into involuntary custody for mental health holds, the plaintiff argued that the hospital, doctor, and nurse functioned as state actors.  *Id.* at 773.  As relevant here, the Tenth Circuit Court of Appeals held that the plaintiff did not allege collusion with government officials that would constitute joint action.  *Id.* at 777.  In fact, the plaintiff had named no government officials as defendants.  *Id.* at 774.  The court also noted that the plaintiff had not demonstrated a symbiotic relationship between the hospital and state.  *Id.* at 779.  The statutory scheme did not mandate placement at the hospital of, or particular treatment for, individuals subject to involuntary mental health holds; nor did the plaintiff allege government involvement in, or contracts regarding, patient care.  *Id.*

*Wittner* serves as a poor analogy for this case because the plaintiffs there asserted state action solely based on the existence of a statutory scheme authorizing involuntary mental health holds.  *Id.* at 774 ("Plaintiffs' state action theory, as set out in the complaint, hinges entirely on the state statutory scheme allowing seventy-two-hour involuntary mental health holds . . ..").  In fact, the Ninth Circuit has found private medical professionals to be liable under section 1983 in similar circumstances.  In *Jensen v. Lane County*, 222 F.3d 570, 573, a private psychiatrist twice signed orders, pursuant to state law, permitting law enforcement to detain the plaintiff in order to conduct a mental health examination.  In finding that the psychiatrist acted under color of law, the

1   Ninth Circuit pointed to three facts: (1) county employees were the ones to initiate the evaluation

2   process leading to involuntary commitment; (2) private psychiatrists consulted extensively with

3   county employees about the process; and (3) private psychiatrists helped to develop the county's

4   mental health policies.  *Id.*  Plaintiff's citation to *Kraft v. Laney*, No. CIV S-04-0129 GGH, 2005

5   WL 2042310 (E.D. Cal. Aug 24, 2005) is even more apt.  The statute at issue there regulated

6   investigatory blood draws following arrests for driving under the influence.  *See id.* at *12.  In

7   finding state action, the court pointed beyond the existence of the statute to the longstanding and

8   formalized relationship between the police and hospital that conducted the blood draws.  *Id.* at

9   *12–13; *see also Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F.Supp.2d 745, 757

10   (finding sufficient allegations of state action to survive motion to dismiss where defendant

11   doctors examined child in state custody for the sole purpose of assisting government agencies in

12   investigating child abuse allegations); *cf. Manda v. Albin*, No. 5:19-cv-01947, 2019 WL 6311380

13   at *10–*11 (N.D. Cal. Nov. 25, 2019) (not finding state action where private physician falsely

14   reported child neglect on her own volition and not pursuant to any contract with the state).

15          Here, like the plaintiffs in *Jensen* and *Kraft*, Plaintiff has alleged a connection between

16   Health Defendants and the government that goes beyond the statutory scheme regulating

17   assessment of child abuse victims.  The SAC alleges that Health Defendants had a contract with

18   Kings County "to provide forensic examination, analysis, and testimony with respect to alleged

19   sexual abuse."  (ECF No. 39 at ¶¶ 13, 14.)  While the allegation that the Kings County District

20   Attorney's office "reviewed, approved, and ratified," (*id.* at ¶ 28), the physical examination of the

21   children is a conclusory statement, other facts alleged in the SAC support the inference of state

22   involvement.  The children's first visit to the SART occurred on the day immediately following

23   their interview at the Kings County Sheriff's Department.  (*See id.* at ¶¶ 24, 27.)  On that day,

24   they did not undergo any physical examination, (*id.* at ¶ 27), indicating that there were no

25   immediate health or safety issues that Ms. Greene had to address.  The children then returned a

26   month later.  (*Id.* at ¶ 28.)  During that visit, Ms. Greene interviewed the children and conducted a

27   physical examination.  (*Id.* at ¶¶ 29–32.)  The interview consisted of leading questions, (*id.* at ¶

28   29), – a type of inquiry suited more toward establishing a timeline than assessing or treating

1    psychological traumas.  Despite discovering a number of "abnormalities" during the physical

2    examination, (*id.* at ¶¶ 30–31), there is no indication that Ms. Greene provided any medical

3    treatment herself or referred the children for treatment with other physicians.  Significantly, Ms.

4    Greene videotaped the examinations, (*see id.* at ¶ 41), indicating a need to record results for

5    purposes beyond treatment.  These factual allegations set forth a plausible scenario in which Ms.

6    Greene provided forensic investigatory services at the direction of the state.  The fact that Ms.

7    Greene later testified for the government at Plaintiff's trial – a service for which the government

8    generally retained her outside of this one case, (*id.* at ¶ 13), – only serves to bolster this inference.

9           These facts and inferences put this case beyond the scope of both *Wittner* and *Jensen* and

10   in a camp more similar to *Kraft*.  In *Wittner* and *Jensen*, the private physicians made medical

11   determinations that involuntary commitment was necessary to serve the health and safety of the

12   individuals in question.  Health Defendants assert that Ms. Greene acted similarly in this case

13   because SART exams can have purposes outside of criminal investigation, such as providing for

14   the health and safety of a victim.  (ECF No. 29 at 7.)  They also assert that the government is not

15   always involved in the administration of these exams.  (*Id.*)  What "could be" is not, however, the

16   same as what was.  While the general purpose of SART exams is relevant to the analysis, it is the

17   application of the exams on the facts of this case that determines whether there was state action.

18   The SAC sufficiently alleges that the purpose of Ms. Greene's examinations was not to assess or

19   preserve the children's health, but rather to conduct an investigation to aid in Plaintiff's

20   prosecution.  Health Defendants were, therefore, acting under color of state law.

21          **ii.      The Eleventh Amendment does not shield Health Defendants from suit.**

22          The Eleventh Amendment shields states, their agencies, and officers acting in their official

23   capacities from lawsuits for damages.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S.

24   89, 99–103 (1984); *Mitchell v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

25   Though states may waive their immunity, the language of section 1983 does not abrogate this

26   immunity.  *Quern v. Jordan*, 440 U.S. 332, 344–45 (1979).

27          Health Defendants argue that, if they are state actors for the purposes of section 1983

28   liability, then they should be entitled to the protections of Eleventh Amendment immunity.  (ECF

No. 19 at 18–19.)  A case that both parties cite to support their positions – *Del Campo v. Kennedy*, 517 F.3d 1070 (9th Cir. 2008) – is directly on point.  (*See* ECF No. 26 at 18; ECF No. 29 at 9.)  There, a private corporation contracted with the Santa Clara County District Attorney to run a diversion program.  *Del Campo*, 517 F.3d at 1072.  The Ninth Circuit held that the Eleventh Amendment can never apply to private entities; even considering Eleventh Amendment immunity would be a "category error."  *Id.* at 1078.  Not only do Health Defendants urge the Court to undergo an Eleventh Amendment analysis, but they also mischaracterize *Del Campo*'s language.  (ECF No. 29 at 9.)  Health Defendants allude to certain factors that courts use to determine when Eleventh Amendment immunity applies to an entity, but those factors are "designed to discriminate between governmental bodies, not to determine whether private entities are arms of the state."  *Id.* at 1077.  Health Defendants also assert that one factor, "whether the entity performs central government functions," is "of particular importance."  (ECF No. 29 at 9.)  This factor is particularly important only to the extent that it is the only one that "could *ever* cut in favor of granting a private entity sovereign immunity." [1]  *Del Campo*, 517 F.3d at 1077 (emphasis in original).  *Del Campo* makes clear, however, that a private entity will always fail the Eleventh Amendment analysis, even if this one factor were to cut in favor of granting sovereign immunity.  *Id.*  The only fact relevant to this analysis is the private nature of the entity – the nature of the contract between the private entity and the government, the behavior of the private entity, and the allegations against the entity are irrelevant.  *Id.* at 1078–79.

Defendants' invocation of *Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993 (N.D. Cal. 1996) is equally unavailing.  (*See* ECF No. 29 at 10.)  In that case, the district court dismissed a county department of corrections as an improper defendant under a section 1983 cause of action.  *Id.* at 995–96.  First, the *Vance* court addressed whether the department of corrections qualified as a "person" within the language of section 1983.  It did not address any arguments about the

---

[1] *Del Campo* discusses five factors relevant to determining whether governmental agencies are subject to Eleventh Amendment immunity: "(1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity." (*Del Campo*, 517 F.3d at 1077 (quoting *United States ex rel. Ali v. Daniel, Mann, Johnson, & Mendenhall*, 355 F.3d 1140, 1147 (9th Cir. 2004)).

1 applicability of the Eleventh Amendment.  Even if the court impliedly addressed the Eleventh

2 Amendment analysis, such a decision would have no impact on this case.  The department of

3 corrections at issue in *Vance* was admittedly an arm of the government – a public entity.  *Id.* at

4 995.  Based on the SAC and the parties' briefing, the Court finds that Adventist Health is a

5 private entity, and that Ms. Greene is a private citizen.  That fact is the very basis for Health

6 Defendants' objection to liability under section 1983.  Therefore, the Court finds that the

7 Eleventh Amendment provides no protection to Health Defendants.

8         **iii.**       **The statute of limitations does not bar Plaintiff's section 1983 claims.**

9        State law regarding personal injury torts governs the applicable statute of limitations for

10 section 1983 claims.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  In California, where the events

11 at issue in this case occurred, the applicable statute of limitations is two years.[2]  Cal. Code Civ. P.

12 § 335.1.  Determining when a section 1983 cause of action has accrued, however, is a question of

13 federal law.  *Wallace*, 549 U.S. at 388.  Accrual occurs at the time a " 'plaintiff can file suit and

14 obtain relief.'"  *Id.* (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar

15 Corp. of Cal.*, 522 U.S. 192, 201 (1997).  The first step in the accrual analysis is to determine

16 which constitutional right is at issue.  *Manuel v. Joliet*, 137 S. Ct. 911, 920 (2017).  After

17 determining the right, courts next look to the common law of torts to define the contours of the

18 section 1983 claim.  *Id.*  "Common law principles are meant to guide rather than to control the

19 definition of § 1983 claims, serving 'more as a source of inspired examples than of prefabricated

20 components.'"  *Id.* at 921 (quoting *Hartman v. Moore*, 547 U.S. 250, 258 (2006)).

21        Plaintiff asserts violations of the due process clauses of the Fifth and Fourteenth

22 Amendments, arguing that Health Defendants fabricated evidence and failed to disclose

23 exculpatory evidence.  (ECF No. 39 at 62.)  The failure of investigators to disclose exculpatory

24 evidence resulting in incarceration is a recognized due process violation.  *See Tatum v. Moody*,

---

26 [2] Health Defendants insist that the applicable statute of limitation is one year by citing to *Kimes v. Stone*, 84 F.3

27 1121, 1128 (9th Cir. 1996).  (ECF No. 19 at 14; ECF No. 29 at 15.)  As discussed above, state law, not Ninth Circuit precedent, governs the applicable statute of limitations.  *Kimes* was decided in 1996, when the applicable statute of limitations was one year.  On January 1, 2003, California Code of Civil Procedure section 335.1 became effective, creating a two-year statute of limitations for personal injury torts.  Section 335.1 was in effect in 2019, when

28 Plaintiff's claim accrued.

768 F.3d 806, 816 (9th Cir. 2014).  Additionally, section 1983 recognizes suits based on the deliberate fabrication of evidence.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001).  It is not entirely clear to the Court, however, that Plaintiff is asserting a claim based on the deliberate fabrication of evidence.  In her briefing, Plaintiff states that "Ms. Greene conducted a reckless exam of the children that resulted in fabricated findings of abuse."  (ECF No. 26 at 23.) This statement elides a deliberate fabrication of evidence allegation with one based on conducting a reckless investigation that "shocks the conscience."  Courts have held that the latter can constitute a due process violation, but they apply a different standard than for fabrication of evidence claims.[3]  *See Wilson v. Lawrence Cnty., Mo.*, 260 F.3d 946 (8th Cir. 2001); *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008); *Figueroa v. Kern Cnty.*, No. 1:19-cv-00558-DAD-JLT, 2021 WL 826216, at *6–*7 (E.D. Cal. Mar. 4, 2021).  Though the Court will address this distinction later, it is not meaningful for the statute of limitations analysis. The Court agrees that fabrication of evidence and reckless investigation claims conform to the same common law tort.

Plaintiff argues that the alleged constitutional violations are analogous to the common law tort of malicious prosecution.  (*See* ECF No. 26 at 27–28 (arguing that Plaintiff's due process claims are analogous to those the Supreme Court addressed in *Heck v. Humphrey*, 512 U.S. 477 (1994) and *McDonough v. Smith*, 139 S. Ct. 2149 (2019), which both analyzed the statute of limitations under a malicious prosecution framework).)  Health Defendants argue that malicious prosecution is an ill fit because they are not the ones who prosecuted Plaintiff.  (ECF No. 29 at 14.)  Rather, they argue, the allegations are more analogous to negligence and fraud claims.  (*Id.*) At the outset, the Court notes that a constitutional violation can resemble more than one common law tort.  *See McDonough v. Smith*, 139 S. Ct. at 2156 n.5.  While the allegations against Health Defendants sound in both fraud and negligence, the Court agrees that the most apt comparison is to malicious prosecution.  Health Defendants' argument that they were not the entity that prosecuted Plaintiff in court is irrelevant to this analysis.  Any party who plays an active role in assisting a prosecution, not just the criminal prosecutors themselves, can be liable for malicious prosecution.  *See Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 791 P.2d 587, 593 n.11 ("A

---

[3] There is no binding Ninth Circuit case law on this point.  *Figueroa*, 2021 WL 826216, at *6.

person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action."); *Nunez v. Pennisi*, 193 Cal. Rptr. 3d 912, 923 (Cal. Ct. App. 2015). Moreover, as Plaintiff demonstrates, courts have held that the analogy to malicious prosecution works best for claims of fabricated evidence and failure to disclose exculpatory evidence. *See e.g., Bradford v. Scherschligt*, 803 F.3d 382, 387–88 (9th Cir. 2015) (fabricated evidence); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 390 (4th Cir. 2014) (*Brady* claims).

Claims analogous to the common law tort of malicious prosecution that challenge the integrity of a conviction do not accrue until criminal proceedings against the plaintiff have terminated in her favor. *McDonough*, 139 S. Ct. at 2154–55. This "favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* at 2157 (citing *Heck*, 512 U.S. at 484–85). Health Defendants argue that these concerns do not exist in this case because, at the time of her criminal case, "Plaintiff did not have to worry about filing a civil suit against the very person prosecuting her." (ECF No. 29 at 14.) Health Defendants misapprehend the basis for this rule. The favorable termination requirement is not concerned with the awkwardness of suing a prosecutor during an ongoing criminal case. Rather, it is concerned with promoting the finality of criminal convictions and respect for state court decisions. *See McDonough*, 139 S. Ct. at 2157. Here, Plaintiff alleges that Ms. Greene's observations and testimony sat at the core of the prosecution's case against her for sexual assault. (ECF No. 39 at ¶ 35.) Filing a lawsuit based on the admission of such evidence would necessarily call into question the integrity of Plaintiff's conviction. Therefore, the earliest Plaintiff could have filed her complaint was March 29, 2019. As discussed above, the applicable statute of limitations at that time of accrual was two years. Plaintiff initiated this lawsuit on May 6, 2020, well within that two-year window. The Court cannot find that the statute of limitations bars suit against Health Defendants for Plaintiff's section 1983 claims.

///

///

13

### iv.     Plaintiff has failed to allege sufficient facts to hold Adventist Health liable under *Monell*.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. at 690, the Supreme Court held that municipalities and other local government units qualify as "persons," and are therefore subject to lawsuits, under section 1983.  To make out a claim under *Monell*, a plaintiff must show that alleged constitutional injuries are a result of the government's policy or custom. *Id.* at 694. Plaintiffs cannot rely merely on a theory of *respondeat superior*. *Id.* at 690.  *Monell* liability can derive either from affirmative governmental action or omissions – such as a failure to train or failure to supervise – that lead government employees to cause constitutional injuries. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012); *see City of Canton v. Harris*, 489 U.S. 378, 387 (1989) (failure to train); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (failure to supervise).  The Ninth Circuit has held that *Monell* liability extends to private entities acting under color of state law.[4] *Tsao*, 698 F.3d at 1139.

To establish a policy of omission, plaintiffs must show (1) that the government's custom or policy amounts to deliberate indifference to the constitutional right at issue, and (2) the custom or policy was "the moving force behind the employee's violation of constitutional rights." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).  A showing of deliberate indifference requires proof that the government disregarded a known or obvious consequence of its failure to train or supervise.  *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Board of Comm'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 410 (1997)).  It is "ordinarily necessarily" to demonstrate a pattern of constitutional violations to make out a *Monell* claim based on a failure to train or supervise. *Id.* at 62.  Such proof shows that policymakers were on notice regarding the constitutional deficiencies of a training or supervision program and chose to perpetuate it. *Id.* There are cases, however, where "the need for more or different training [or supervision] is so

---

[4] Defendants cite to *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) in an apparent attempt to convince this Court that *Monell* does not apply to private entities.  (ECF No. 29 at 10.)  If that were the holding of *Shields*, Defendants' argument would be one that inappropriately asks this Court to contravene established Ninth Circuit precedent.  Even a cursory glance at *Shields*, however, demonstrates that it re-asserts Seventh Circuit precedent extending *Monell* liability to private entities. *Id.*  The real force of *Shields* is that it makes the case for *expanding* section 1983 liability of private entities to include suits based on *respondeat superior* theories.  *See id.* at 790–96.

1   obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

2   policymakers . . . can reasonably be said to have been deliberately indifferent to the need."

3   *Harris*, 489 U.S. at 390.  Such single-incident cases are rare, and they only occur when the

4   consequences of failing to train or supervise are "patently obvious."  *Kirkpatrick v. Cnty. of*

5   *Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (quoting *Connick*, 563 U.S. at 63).

6        The SAC alleges that Health Defendants fabricated evidence and failed to disclose

7   exculpatory evidence.  (ECF No. 39 at ¶ 58.)  Health Defendants argue that Plaintiff's failure to

8   allege a pattern of such behavior forecloses the possibility of liability under *Monell*.  (ECF No. 19

9   at 20.)  In the alternative, Health Defendants argue that Ms. Greene's alleged conduct was so

10  obviously unconstitutional that any lack of training or supervision is irrelevant.  (*Id.*)  Considering

11  the complaint's allegations in the light most favorable to Plaintiff, the Court agrees that the

12  complaint fails to state facts sufficient to find that Adventist Health was on notice of Ms.

13  Greene's alleged constitutional violations.

14       Here, again, the Court must address the nature of Plaintiff's "fabricated evidence" claim

15  because Plaintiff's ability to cure the complaint's deficiencies depends on Ms. Greene's alleged

16  state of mind.  The term "fabricated evidence" implies intentional action on the part of Ms.

17  Greene – either falsifying documents or committing perjury.  If this were the case, the Court

18  would agree with Health Defendants that Plaintiff would need to show a pattern of behavior in

19  order to make out a *Monell* claim.  Such conduct would be blatantly unconstitutional and illegal,

20  and it would be unreasonable to blame any policy or custom of Adventist Health as the cause for

21  a single instance.  *See Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1160–61 (9th Cir. 2014)

22  (holding that county cannot be held liable for failure to train officers not to commit sexual

23  assaults based on single incident because of the "clear criminality" of such conduct); *Walker v.*

24  *City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992) (holding that the obligation not to

25  commit perjury was so obvious that a failure to train or supervise would not have had an effect on

26  the officers' ultimate decision to testify falsely).

27  ///

28  ///

If, however, Plaintiff is alleging that Ms. Greene conducted an investigation so reckless that it violated due process, a pattern of prior instances may not be necessary.[5]  For example, it could be sufficient for Plaintiff to allege that Adventist Health had no supervision policy at all. *See Kirkpatrick*, 843 F.3d at 796 (holding that proving a pattern not necessary where county had no policy in place to train social workers regarding when it was necessary to obtain a warrant prior to removing children from parental custody); *Gregory v. City of Louisville*, 444 F.3d 725, 753–54 (6th Cir. 2006) (holding that plaintiff alleged sufficient facts to survive summary judgment on a *Monell* claim where evidence indicated training for officers on handling exculpatory material was "nonexistent").  Based on the allegations in the complaint, the nature of Ms. Greene's role on the SART appears to have been one closely tied to law enforcement and frequently involved in the county's prosecutorial mechanism.  This role would require both specialized medical and legal training, the complete absence of which would show deliberate indifference to the constitutional rights of criminal defendants.  Plaintiff does allege that the Kings County Sheriff's Department and District Attorney's Office "entirely lacked a mechanism for supervision and formal review" of SART conduct.  (ECF No. 39 at ¶ 41.)  Without more, however, the Court cannot impute this blanket lack of supervision on the part of the county to Adventist Health.  At another point in the SAC, Plaintiff alleges that both Health Defendants and County Defendants had "no or inadequate training and supervisions" regarding the SART employees and examinations.  (*Id.* at ¶ 72(i)–vi.)  This conclusory statement implies that Adventist Health may have had some form of supervision, but the Court cannot discern any specifics regarding that policy or how it may have been inadequate apart from this isolated incident.  Plaintiff has, therefore, failed to meet her burden to demonstrate that Adventist Health is liable for inadequate training or supervision of Ms. Greene.  The third claim, as applied to Adventist Health, is dismissed, without prejudice.

///

///

///

---

[5] The following analysis also applies to the allegation that Ms. Greene failed to disclose exculpatory evidence.

**v.    Adventist Health cannot be sued pursuant section 1983 under a theory of supervisory liability.**

Plaintiff's claim that Adventist Health is subject to supervisory liability is either duplicative of her *Monell* claim or attempting to assert a theory based on *respondeat superior*. In either case, the court must dismiss it.  As discussed above, the Ninth Circuit has engrafted the Supreme Court's *Monell* framework, in full, onto private entities.  *See Tsao*, 698 F.3d at 1139.  Under this framework, private entities cannot be liable under a section 1983 cause of action solely on the basis of a *respondeat superior* theory.  *See id.* at 1139, 1143–44.  Plaintiff's third claim, as applied to Adventist Health, is dismissed, with prejudice.

**B.    Claims pursuant to California state law (Claims 4, 5, and 6)**

**i.    The Court will exercise subject matter jurisdiction over the state law claims as they relate to Ms. Greene only.**

"Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Congress, through statute, determines the extent of a district court's subject matter jurisdiction.  *Hamer v. Neighborhood Housing Servs. of Chicago*, 138 S. Ct. 13, 17 (2017).  For example, and as relevant here, 28 U.S.C. § 1331 confers jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States."  When a case raises such a federal question, courts may also exercise supplemental jurisdiction over related state law claims stemming from the same case or controversy.  *See* 28 U.S.C. § 1367(a).  The party asserting federal court jurisdiction has the burden of establishing that the federal court has jurisdiction over the matter.  *Kokkonen*, 511 U.S. at 377.

While Plaintiff failed to allege supplemental jurisdiction in her initial complaint, she subsequently remedied that deficiency: Plaintiff's SAC alleges supplemental jurisdiction over the state law claims in this case.  (ECF No. 39 at ¶ 6.)  The basis for Plaintiff's state law claims stem from the same events giving rise to the federal question claims.  Because the Court is dismissing the section 1983 claims against Adventist Health, however, it will decline, at this time, to exercise supplemental jurisdiction as to Adventist Health only, pursuant to 28 U.S.C. § 1367(c)(3).  Therefore, the following discussion regarding Plaintiff's state law claims addresses only the

1    fourth and sixth claims as they relate to Ms. Greene.

2        **ii.    California's statute of limitations bars Plaintiff's state law claims.**

3        The California Supreme Court has held that the rule in *Heck v. Humphrey* barring civil

4    suits necessarily invalidating a plaintiff's prior criminal conviction applies with equal force to

5    state law tort claims. *Yount v. City of Sacramento*, 183 P.3d 471, 484 (Cal. 2008). In so doing,

6    the *Yount* court reiterated the concern in *Heck* regarding the use of civil suits as mechanisms of

7    collateral attack against criminal convictions. *Id.* at 480 (citing *Heck*, 512 U.S. at 484). To

8    determine when a state tort suit is *Heck*-barred, California courts employ a three-part test. *Yount*,

9    183 P.3d at 478–79. First, the court determines the "acts or omissions" that formed the factual

10   basis for the conviction. *Id.* at 479. Then, the court determines what alleged misconduct forms

11   the factual basis for the civil rights suit. *Id.* Finally, the court considers the relationship between

12   the first two steps. *Id.*

13       Health Defendants argue that *Yount* is inapplicable because the California Supreme Court

14   in that case held that *Heck* did not bar the plaintiff's civil suit.[6] (ECF No. 29 at 15.) The state

15   court's announcement of a rule adopting the reasoning in *Heck*, however, is not the same as that

16   court's application of the rule to the facts at issue in that case. Employing the *Yount* analysis, in

17   this case, the Court finds that (1) Plaintiff has alleged that Ms. Greene's interviews and physical

18   examinations of the children were acts that sat at the very core of the government's criminal case

19   against Plaintiff; (2) Ms. Greene's conduct during and after the interviews and examinations

20   forms the factual basis for the instant suit against her; and (3) not only are the facts alleged in the

21   first two steps related, but they are nearly identical.

22       Put another way, Plaintiff alleges that, Ms. Greene was, at the very least, reckless in

23   failing to employ appropriate procedures and protocols for interviewing the children and

24   performing physical examinations, thereby causing Plaintiff to suffer a conviction and

---

[6] Health Defendants partially misread the holding of *Yount*. In that case, the plaintiff had entered a guilty plea to, among other charges, misdemeanor resisting an officer after an extended struggle during which he bit, spat at, cursed at, and kicked the arresting officers. *Yount*, 183 P.3d at 476. During this struggle, one officer shot the plaintiff in the upper thigh. *Id.* The California Supreme Court held that the plaintiff's conviction did not bar a section 1983 claim asserting the unjustified use of deadly force. *Id.* at 481. It did, however, bar any claim alleging only unlawful arrest or the use of reasonable force to respond to the plaintiff's resistance. *Id.* at 482.

confinement for sexual abuse charges.  (ECF No. 39 at ¶ 83.)  To succeed on this theory, Plaintiff must demonstrate that, but for Ms. Greene's conduct during her investigation, Plaintiff would not have suffered a conviction and subsequent imprisonment for sexual abuse charges.  Succeeding on this claim, therefore, would necessarily imply the invalidity of Plaintiff's prior conviction and imprisonment.  *See Jones v. Whisenand*, 214 Cal. Rptr. 3d 72, 82–83 (Cal. Ct. App. 2017) (requiring favorable termination in professional negligence suit against attorney where success on the merits would necessarily imply the invalidity of plaintiff's confinement); *Coscia v. McKenna & Cuneo*, 25 P.3d 670, 673–74 (Cal. 2001) ("[A]n individual convicted of a criminal offense must obtain reversal of his or her conviction, or other exoneration by postconviction relief, in order to establish actual innocence in a criminal malpractice action. . . . [P]ublic policy considerations require that only an innocent person wrongly convicted be deemed to have suffered a legally compensable harm.").

Had Plaintiff been permitted to raise this claim while her prior convictions stood, her suit would have struck at the heart of the concerns for judicial integrity and finality discussed in both *Heck* and *Yount*.  Because of this, the Court finds that *Heck* and *Yount* would have barred Plaintiff's fourth and sixth causes of action until the time her conviction was reversed.

The California Supreme Court's wholesale adoption of the rule announced in *Heck*, however, does not necessarily imply its adoption of the reasoning in *McDonough v. Smith* regarding the date of accrual for the statute of limitations.  When interpreting state law, federal courts must follow decisions of a state's highest court.  *Paulson v. City of San Diego*, 294 F.3d 1124, 1128.  The California Supreme Court has spoken contrary to *McDonough* regarding the issue of accrual in cases where plaintiffs must demonstrate a favorable termination of their criminal charges.

In *Coscia v. McKenna & Cuneo*, 25 P.3d at 671–72, the plaintiff sued his criminal defense attorneys, alleging that the firm provided negligent legal advice that resulted in the plaintiff taking a plea deal.  The court held that, to succeed on a legal malpractice claim stemming from a criminal proceeding, a plaintiff must first demonstrate exoneration of the underlying conviction.  *Id.* at 672.  The court then addressed the problem with this requirement: "Because of the time

19

1   required to complete postconviction proceedings, the statute of limitations in most cases will have

2   run long before the convicted individual has had an opportunity to remove the bar to establishing

3   his or her actual innocence." *Id.* at 677.  The *Coscia* court went on to summarize how other states

4   have dealt with this concern.  On the one hand, some states, like the Supreme Court in

5   *McDonough*, set the accrual date in legal malpractice claims on the day a plaintiff receives a

6   favorable termination of the underlying criminal conviction.  *Id.* at 678 (citing state supreme court

7   cases out of Virginia, Alaska, and Oregon).  On the other hand, some states have adopted a "two-

8   track approach."  *Id.*  In these states, the statute of limitations begins to run on the date the

9   plaintiff "knew she had a possible claim against her criminal defense counsel."  *Id.* (citing

10  *Gebhardt v. O'Rourke*, 444 N.W.2d 900, 906 (Mich. 1994).  The California Supreme Court chose

11  to follow the latter approach, setting the statute of limitations in motion on the date the plaintiff

12  suffered or learned of his or her injury, rather than on the date of his or her exoneration.  *Id.* at

13  483.  In so holding, the court noted that it is a legal fiction to say that a plaintiff suffering from a

14  wrongful conviction does not experience actual injury until receiving postconviction relief.  *Id.*

15  Additionally, the court noted that tying the date of accrual to the date of exoneration would

16  undermine the purpose of statutes of limitations: to " 'protect defendants from having to defend

17  stale claims by providing notice in time to prepare a fair defense on the merits.'"  *Id.* (quoting

18  *Downs v. Dept. of Water & Power*, 68 Cal. Rptr. 2d 590, 593 (Cal. Ct. App. 1997)).

19       While *Coscia* dealt with accrual for claims involving legal malpractice, the breadth of its

20  reasoning encompasses the claims in this case.  The *Coscia* court rejected the reasoning of state

21  court opinions analogous to *McDonough*.  Additionally, the court's concerns about protecting

22  defendants from stale claims and recognizing the fact of actual injury on the date of conviction is

23  as applicable in a case like the instant one as it would be in a legal malpractice case.  Finally, the

24  Court notes that *McDonough* does not overrule *Coscia*.  Rather, *McDonough* is a case interpreting

25  a rule of federal law previously announced in *Heck*.  *See Yount*, 183 P.3d at 484 ("*Heck*, of

26  course, is a rule of federal law that applies only to federal causes of action that challenge the

27  validity of a state conviction.").  This Court, therefore, is bound by *Coscia*'s logic and holding.

28  ///

1    The California statute of limitations in negligence actions is two years.  Cal. Code Civ. P.

2    § 335.1.[7]  The date of accrual for a negligence action in California is the "time when the cause of

3    action is complete with all of its elements."  *Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999).

4    The elements of a negligence claim under California law are duty, breach, causation, and injury.

5    *Vasilenko v. Grace Family Church*, 404 P.3d 1196, 1198 (Cal. 2017).  The statute of limitations

6    will not begin to run, however, while the plaintiff is unaware of the cause of action.  *See id.*

7    Rather, the statute of limitations begins to run at the time the plaintiff knew or should have known

8    about the claim.  *Id.*

9    Applying these rules to this case leads to a muddled result.  As far as claims premised on

10   the content of Ms. Greene's physical examinations and trial testimony, the Court finds that the

11   statute of limitations began to run at the time of Plaintiff's 2002 conviction.  At that point

12   Plaintiff would have suffered an injury – wrongful incarceration – and known that the injury was

13   attributable to Ms. Greene's examination results and testimony.  Pursuant to *Coscia*, Plaintiff

14   could have tolled the statute of limitations by filing a civil suit and asking the court to stay

15   proceedings until the resolution of any postconviction proceedings.  Because she did not, the

16   statute of limitations has expired.

17   The statute of limitations issue differs, however, to the extent that Plaintiff's state law

18   claims are premised on Ms. Greene's failure to disclose exculpatory evidence.  The SAC alleges

19   that Plaintiff first learned of the existence of video recordings of Ms. Greene's examinations after

20   receiving a response to a subpoena during her habeas corpus proceedings.  (ECF No. 39 at ¶ 41.)

21   Plaintiff filed her petition for writ of habeas corpus on October 23, 2017.  (*Id.* at ¶ 45.)  There is,

22   however, no information in the SAC or in the briefing from either party about when Plaintiff

23   learned of the videotapes.  This fact is significant because it was not until Plaintiff learned of the

24   existence of the videotapes that her state law claims accrued.  Plaintiff claims that withholding the

25   videotapes was a cause of her incarceration.  Without knowledge of the fact of withholding,

26   Plaintiff could not have discovered the causation element of her negligence claim or the due

---

[7] This two-year statute of limitations period applies both to Plaintiff's negligence claim and to her claim under the Tom Bane Act.  *See Gatto v. Cnty. of Sonoma*, 120 Cal. Rptr. 2d 550, 561 (Cal. Ct. App. 2002) (applying then-applicable negligence statute of limitation to Bane Act claims).

1    process basis of her Bane Act claim.  Plaintiff's state law claims would, therefore, be timely if she

2    discovered this fact after May 6, 2018.  Because Plaintiff has not pleaded any facts to illuminate

3    this issue, the Court must, at this time, dismiss claims four and six, without prejudice.

4           Because the Court cannot anticipate whether Plaintiff will plead facts sufficient to

5    overcome the statute of limitations barrier, it will decline to address the arguments regarding

6    Plaintiff's Bane Act claim at this time.

7    **C.**        **State law immunities do not protect Health Defendants.**

8           Because the Court is granting Plaintiff leave to amend the SAC, it will address Health

9    Defendants' arguments regarding state law immunities in order to avoid repetitive briefing.  The

10    Court's analysis of the availability of these immunities, unlike its analysis of the Bane Act claim,

11    does not hinge on any changes Plaintiff might make to the complaint.

12           At the outset, the Court notes that Health Defendants are unable to assert state law

13    immunities as defenses to Plaintiff's section 1983 claims.  *Wallis v. Spencer*, 202 F.3d 1126, 1144

14    (9th Cir. 2000).  As described below, Health Defendants' arguments that these immunities bar

15    Plaintiff's state law claims are also unconvincing.

16             **i.**        **California Government Code section 8659 does not apply in this case.**

17           Health Defendants claim they are immune to suit because they rendered services to sexual

18    assault victims during the existence of a "local emergency."  (ECF No. 19 at 17.)  California

19    Government Code section 8659(a) states:

20                  Any physician or surgeon . . ., hospital, pharmacist, respiratory care
21                  practitioner, nurse, or dentist who renders services during any state
                  of war emergency, a state of emergency, or a local emergency at the
22                  express or implied request of any responsible state or local official
                  or agency shall have no liability for any injury sustained by any
23                  person by reason of those services, regardless of how or under what
                  circumstances  or  by  what  cause  those  injuries  are  sustained;
24                  provided, however, that the immunity herein granted shall not apply
                  in the event of a willful act or omission.

25        A local emergency is "the duly proclaimed existence of conditions of disaster or of

26    extreme peril to the safety of persons and property."  Cal. Gov. Code § 8558(c)(1).  Health

27    Defendants seemingly cite to *Cal. Corr. Peace Officers Assn. v. Schwarzeneggar*, 77 Cal. Rptr.

28    3d 844, 856 (Cal. Ct. App. 2008) for the proposition that an emergency can be proclaimed by

implication.  (ECF No. 29 at 16.)  This is incorrect.  Rather, *Schwarzaneggar* states that the

issuance of a proclamation implies that the government has made the necessary factual findings to

justify the proclamation.  *Id.*  The plain text of the statute still requires an official proclamation.

*See* Cal. Gov. Code § 8558(c)(1).  Health Defendants gesture toward Governor Newsom's 2020

proclamation declaring April "Child Abuse Prevention Month."  Proclamation declaring April

2020 "Child Abuse Prevention Month" (Apr. 7, 2020), https://www.gov.ca.gov/wp-

content/uploads/2020/04/April-2020-Child-Abuse-Prevention-Month.pdf.  (ECF No. 29 at 16.)

The proclamation makes no mention of a state of emergency; nor does it invoke the Governor's

authority under California's Government Code.  The Governor issued the proclamation,

moreover, in 2020, eighteen years after Health Defendants examined the children in this case.  As

the text of section 8659 states, any immunity would only apply "*during* any . . . local emergency."

Cal. Gov. Code § 8659(a) (emphasis added).  Health Defendants cannot claim immunity under

California Government Code section 8659.

> **ii.  Though they may act "under color of law," Health Defendants are not "public**
> **entities."**

Whether Adventist Health is a public entity, and whether Ms. Greene is a public employee

by way of her relationship to Adventist Health, appears to be a source of confusion for both

parties.  In her second amended complaint, Plaintiff asserts a claim against Adventist Health

under California Government Code section 815.2., which applies only to public entities.  (ECF

No. 39 at § VII(E).)  At the same time, Plaintiff argues that Health Defendants' claims of

immunity under California Government Code sections 855.6, 818.2, 820.2, and 815.4 and Health

Defendants' assertion of Plaintiff's failure to comply with the presentation requirement of

California Civil Code section 910, are invalid because Adventist Health is not a public entity and

Ms. Greene is not a public employee.  (ECF No. 26 at 29–32.)  For their part, Health Defendants

consistently and erroneously assert that liability under section 1983 transforms them into "public

entities."  (*See, e.g.,* ECF No. 29 at 16.)  This is a false equivalence.  In fact, it is an argument

similar to the one Health Defendants make to assert immunity under the Eleventh Amendment.

This argument fails here, as it did above.

1    Health Defendants burrow into California statutory definitions in their attempt to prove

2    their qualification as public entities under state law.  The journey begins with a citation to

3    California Government Code section 811.2, (ECF No. 19 at 26), which defines a "public entity"

4    as "the state, the Regents of the University of California, the Trustees of the California State

5    University and the California State University, a county, city, district, public authority, public

6    agency, and any other political subdivision or public corporation in the State."  California

7    Government Code section 6252(d), in turn, defines a "public agency" as "any state or local

8    agency."  Finally, we arrive at California Government Code section 8557(a), which defines a

9    "state agency" as "any department, division, independent establishment, or agency of the

10   executive branch of the state government."  Here, Health Defendants conclude that Adventist

11   Health is an "independent establishment" and, therefore, a state agency, making Ms. Greene a

12   public employee.  (ECF No. 29 at 16.)  Health Defendants support their conclusion without

13   citation to case law.  The work remains for this Court, therefore, to determine whether the term

14   "independent establishment" in section 8557(a) has such a broad definition that it can encompass

15   private actors like Health Defendants.

16   When interpreting state law, federal courts must follow decisions of a state's highest

17   court.  *Paulson*, 294 F.3d at 1128.  "When the state supreme court has not spoken on an issue, we

18   must determine what result the court would reach based on state appellate court opinions, statutes

19   and treatises."  *Id.* (quoting *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991).  The term

20   "independent establishment" appears exactly once in California statutory law.  No California

21   courts have defined the term.  Nevertheless, in applying common tools of statutory construction

22   and looking to other jurisdictions, this Court concludes that Health Defendants do not qualify as

23   "independent establishments" under California law.

24   When defining a statutory term, courts must not only look to the dictionary, but must also

25   consider the broader context of the statute.  *See Yates v. U.S.*, 574 U.S. 528, 537 (2015).  To assist

26   with this process, courts sometimes use the "principle of *noscitur a sociis* – a word is known by

27   the company it keeps – to 'avoid ascribing to one word a meaning so broad that it is inconsistent

28   with its accompany words . . .."  *Id.* at 543 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575

24

1    (1995)); *see also Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021).  The terms

2    surrounding "independent establishment" in section 8557(a) cabin the definition to entities

3    created by statute under the auspices of the state's executive branch.  Courts that have defined the

4    term "independent establishment" in other contexts have come to a similar conclusion.  *See*

5    *S.E.C. v. Syon*, 934 F. Supp. 2d 609, 622–25 (S.D.N.Y. 2013) (holding that a federally chartered

6    corporation is not an "independent establishment" for purposes of the Federal Exchange Act

7    because "with few exceptions, the only entities deemed to be 'independent establishments' are

8    those Congress has explicitly designated as such") (citing *S.E.C. v. Mudd*, 885 F. Supp. 2d 654,

9    664 (S.D.N.Y. 2012)).

10          In an analogous situation, the Seventh Circuit created a four-factor test to determine when

11   an entity qualifies as a "federal agency" under the Federal Tort Claims Act.[8]  *Mendrala v. Crown*

12   *Mortg. Co.*, 955 F.2d 1132, 1136 (7th Cir. 1992).  Those four factors are: "(1) the federal

13   government's ownership interest in the entity; (2) federal government control over the entity's

14   activities; (3) the entity's structure; (4) government involvement in the entity's finances; and (5)

15   the entity's function or mission."  *Id.*  Adopting this test here proves useful.  Regarding factors

16   one, two, and four, neither party alleges that the government has an ownership interest in

17   Adventist Health, exercises control over Adventist Health's activities, or is involved in any way

18   with Adventist Health's finances.  While Plaintiff alleges collusion between Health Defendants

19   and Kings County, there is no allegation that the county operates the hospital as an arm of the

20   state or subjects it to fiscal oversight.  In terms of the third factor, the SAC and the briefing of

21   both parties allege that Adventist Heath is structured as a private entity.  The fifth factor is the

22   only one that could weigh in favor of finding Adventist Health to be a public entity.  To some

23   degree, Plaintiffs are alleging that it is the function of the SART to provide forensic investigatory

24   services to the government.  SART, however, is only one division within a broader private health

25   apparatus.  To claim that an entire hospital qualifies as a public entity because one small part of it

26   _____

27   [8] The FTCA defines a "federal agency" as "the executive departments, the judicial and legislative branches, the
     military departments, independent establishments of the United States, and corporations primarily acting as
     instrumentalities or agencies of the United States, but does not include any contractor with the United States."  28
28   U.S.C. § 2671.

collaborates with law enforcement would defy logic.  Beyond that, however, Health Defendants claim that SART also provides non-forensic services to individuals who have suffered sexual abuse.  The function or mission of SART, therefore, seems to be broader than providing criminal investigatory services, even though it may have acted under color of law for the purposes of this particular case.

Health Defendants are not public entities under California law.  Therefore, none of the state law defenses under California Government Code sections 855.6, 818.2, 820.2, 815.2, and Civil Code section 910 apply to the claims against them.  By the same token, the Court must dismiss Plaintiff's fifth claim as it applies to Adventist Health, with prejudice.

**D.      The Court grants Plaintiff leave to amend the SAC.**

Generally, "[c]ourts are free to grant a party leave to amend whenever 'justice so requires,' and requests for leave should be granted with 'extreme liberality.'"  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009).  There are several factors a district court considers when deciding whether to grant leave to amend, including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility.  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Of the *Foman* factors, the court should particularly consider prejudice to the opposing party.  *Id.*; *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Applying the second and fifth *Foman* factors to this case, the Court finds that Plaintiff has not acted in bad faith and that it would not be futile to grant another opportunity to cure deficiencies in the complaint.  Regarding the third factor, the Court notes that, while Plaintiff has already filed two amended complaints, it appears those amendments have come from conversations with County Defendants.  The Court has no information about whether Plaintiff and Health Defendants have met and conferred regarding the allegations in the complaint or the substance of their motions.  To streamline this process, the Court will direct the parties to meet and confer prior to filing any motions, pursuant to the Court's Standing Order in Civil Actions.  E.D. Cal. S.O. J. de Alba at 2.  Additionally, the parties must include in their motions "a

declaration that the parties exhausted meet and confer efforts, with a very brief summary of said efforts." *Id.* Finally, considering the first and fourth factors, the Court recognizes that this matter was filed over two years ago, and that Health Defendants filed their amended motion to dismiss on August 4, 2020. The substantial delay in this case has likely prejudiced both parties, but that delay is attributable to the Court alone. The Court cannot permit its overcrowded docket to result in the dismissal, with prejudice, of potentially meritorious claims. Plaintiff will, therefore, be granted leave to amend the complaint to address the deficiencies noted in this order.

Accordingly,

1.     Health Defendants' motion to dismiss Claim 1 against Ms. Greene is DENIED;

2.     Claims 4 and 6 against Ms. Greene are DISMISSED, without prejudice;

3.     Claims 2, 4, and 6 against Adventist Health are DISMISSED, without prejudice;

4.     Claims 1, 3, and 5 against Adventist Health are DISMISSED, with prejudice;

5.     Plaintiff is granted leave to amend the SAC within twenty-one (21) days of service of this order.

IT IS SO ORDERED.

Dated:   October 18, 2022   

_____
UNITED STATES DISTRICT JUDGE